Eastern Milk Producers' Cooperative Association, Inc., *v.* Commonwealth of Pennsylvania, Milk Marketing Board, Respondent.

Argued March 13, 1984, before President Judge CRUMLISH, JR. and Judges ROGERS, WILLIAMS, JR., CRAIG, MACPHAIL, BARRY and COLINS.

*Henry B. Fitzpatrick, Jr.,* with him, *Marcy B. Tanker, Liebert, Short, Fitzpatrick & Lavin,* and *Frederick J. Micale, Williams, Micale & Wells,* for petitioner.

*Mollie A. McCurdy,* Deputy Attorney General, with her, *Allen C. Warshaw,* Deputy Attorney General, Chief, Litigation Section, and *LeRoy S. Zimmerman,* Attorney General, for respondent.

OPINION BY PRESIDENT JUDGE CRUMLISH, JR., July 25, 1984:

Eastern Milk Producers' Cooperative Association, Inc. (Eastern) appeals a Milk Marketing Board (Board) order which certified the payment to Eastern of a claim from the Milk Producers and Cooperative Security Fund.[1] We affirm in part and reverse in part.

In 1982, Sun Re Cheese Corporation (Sun Re) defaulted in payments to milk producers. On November 24, 1982, the Board notified all milk producers of the default. Three producers, including Eastern, who was the major supplier of milk to Sun Re, filed verified claims with the Board by December 16, 1982.[2] Sub-

---

[1] The Milk Producers' and Cooperative Security Funds Act (Act), Act of July 10, 1980, P.L. 481, *as amended,* 31 P.S. §625.1-625.23, provides for partial reimbursement to milk producers who are not paid for their milk by dealers.

[2] Eastern, the major supplier of milk to Sun Re, filed claims of $651,008.75. Danville State Farm filed a verified claim of $15,083.57 and the Farmers Cooperative Dairy filed a verified claim of $27,211.-70,

sequent to Sun Re's default, two other milk dealers, Shadowbrook Farms, Inc. (Shadowbrook)[3] and Damon Dairy Processing (Damon),[4] defaulted on payments to producers for delivered milk.[5]

Upon Damon's default, the claims against the security fund far exceeded the amount available, which was $734,157.04 at the end of December, 1982. The Act does not establish an order of priority among creditors who file claims under the Act. On January 5, 1983, the Board asked the Attorney General to delineate in a formal opinion the priority of payment schematic from the security fund. On February 24, 1983, he recommended a pro rata distribution of the fund.[6] On March 30, 1983, the Board certified the claims against Sun Re, Shadowbrook and Damon even

---

[3] On November 30, 1982, the Board notified producers of Shadowbrook's default. A single claim by Dairylea Cooperative of $63,114.-21 was filed on December 6, 1982.

[4] On January 4, 1983, the Board notified producers of Damon's default. Claims were received from seventy-seven producers and shippers totaling over one million dollars.

[5] The Board held the following hearings: Sun Re's default on January 17, 1983; Shadowbrook's default on January 18, 1983; and Damon's default on February 17-18, 1983.

[6] The recommendation set forth the following procedure:

a. The Board shall extend the time period for certification of claims until all claims can be duly examined and certified.

b. At that time, the Board shall determine a percentage figure to apply to all claims by using the following calculation:

$$\frac{\text{Total available funds} \times 100}{\text{Total combined claims certified}} = \text{———}\%$$

c. The Board shall apply the percentage factor to each verified claim.

d. The Board shall then certify these amounts to the appropriate fiscal agent for payment.

e. "Total available funds" under the formula includes monies and accrued interest received by the Milk Producers' Security Fund on or before January 31, 1983.

though Sun Re was the first dealer in default. The Board divided the total available funds ($734,157.04) by the total combined certified claims ($1,603,005.10) and determined that each claimant should receive 45.7988% of its certified claim instead of the 75% of the certified claim provided in the Act.[7] Eastern received $264,033.69 out of its proposed certified amount, $576,507.88.

The Act provides the procedures in processing claims against the security fund.[8] Eastern contends first that the Board abused its discretion by extending the time period for certification of claims caused by Sun Re (and Shadowbrook) until the claims caused by Damon's default were certified. Eastern argues that the Board was mandated under Section 8(c) of the Act[9] to certify its claim within forty-five days from the filing of its verified claims. The certification was required to be filed by January 31, 1983, forty-five days after December 18, 1982, when the last affected producer filed verified claims.[10] Instead, on January

---

f. Funds received after January 31, 1983, shall be invested separately to begin rebuilding the Milk Producers' Security Fund.

[7] 31 P.S. §625.8(b) provides: "No claims shall be allowed for deliveries of milk by a producer in excess of 75% of the blend price amount owed for a period of no more than ten days longer than the applicable pay period. . . ."

[8] The Board shall notify those producers believed to be affected to file verified claims. 31 P.S. §625.8(a). After examining the claims, the Board shall hold a hearing and certify the amount due each claimant. 31 P.S. §625.8(c). The Board's certification shall be filed with the fiscal agent and interested parties within forty-five days after the claimants have filed verified claims. 31 P.S. §625.8-(c).

[9] 31 P.S. §625.8(c) provides: "The certification of the amount due shall be filed with the fiscal agent and interested parties within 45 days after the claimants have filed verified claims."

[10] The Board explains that January 31, 1983 was selected as the severance date because that is the date when the fund received pay-

31, 1983, the Board on its own motion, extended the statutorily-prescribed period indefinitely.

The Board argues that "shall" under Section 8(c) of the Act was legislatively intended to be considered as directory rather than mandatory to meet the Act's objective in protecting the milk producers as a collective group against the loss of payment for milk because of dealers' default. We have stated,

> The word "shall" may be interpreted as either mandatory *or* directory, but "[w]hen referring to the time of doing something, shall has usually been considered as directory". . . .

Our Supreme Court held that:

> The provisions of a statute requiring public officers to act within a specified time are generally regarded as directory, unless time is of the essence of the thing to be done, or the statute indicates that the provision is to be regarded as mandatory. (Citations omitted.) (Emphasis in original.)

*Lang v. Tax Review Board, City of Philadelphia*, 69 Pa. Commonwealth Ct. 525, 528-29, 451 A.2d 1057, 1058 (1982). Eastern has been prejudiced by the delay since it could have been paid its statutory share if the Act's certification process were followed. Time is clearly of the essence. Therefore, we interpret "shall" to be mandatory in this case.

We further hold that the Board improperly severed the monies available to pay Eastern as of January 31, 1983, when it did not certify the default until March 30, 1983. The record reveals that, if the Board made

---

ments for milk purchased in December, 1982, the last month of the claim period for producers owed by Damon. The Board argues that, if there were no cut-off date, the fund would constantly be bankrupt. We disagree. The remaining claims will be compensated, when the fund is replenished.

available the monies in the fund it had received after January 31, 1983, there would have been enough to pay the Sun Re and Shadowbrook claimants the statutorily-required 75%.

Eastern contends next that the Board abused its discretion by dividing the assets of the fund pro rata rather than by priority. We agree. The Board defends its decision by relying on Section 12(a) of the Act, which provides "[i]f recovery upon the bond or alternative security is not sufficient to pay all claims, the amount recovered shall be divided pro rata among claimants." 31 P.S. §625.12(a). This case does not deal with dealers who post a bond or an alternative form of security other than the security fund; therefore, Section 12(a) of the Act does not apply.

We interpret the Act to authorize the distribution on a priority basis rather than a pro rata basis. Otherwise, the Board may arbitrarily await other defaults instead of carrying out the certification process prescribed in the statute.

Following Sun Re's default, Eastern and two other producers were the first to file verified claims against the fund. The position of Eastern and the two other producers became analogous to that of senior lien holders. Applying the general equitable principle of first in time is first in right, the fund should be distributed to the competing claimants in the chronological order of their claims.

We hold the Board abused its discretion in deferring Eastern's certification date, by improperly severing the monies on January 31, 1983, and in distributing the security fund pro rata rather than by priority.

Eastern contends further that the Board abused its discretion by excluding $50,000.00 administrative expenses from the fund. We disagree. Our review of

the record tells us that these were valid expenses. Under the provisions of the Act, the Board had the authority to deduct these expenses from the fund. The Act provides:

> The expense of administering the provisions of the security fund and of administering section 6 shall be paid from the fund by the fiscal agent at the direction of the board. Such payments shall not exceed 1 1/4% of the total fund or $50,000 per annum, whichever is greater.

31 P.S. §625.7(a).

Eastern's final contention is that the Board abused its discretion (1) by disallowing Eastern's claim of $3,024.96 for high bacteria milk it delivered to Sun Re and (2) by offsetting Eastern's claim by $6,398.23 for cream. The high bacteria milk was considered non-saleable by the Pennsylvania Department of Agriculture. Due to the inferior quality of the high bacteria milk, dealers may opt to return it to the producers. See 7 Pa. Code §143.44(a)(1). Eastern does not dispute the Board's contention that the fund did not receive contributions from the sale of high bacteria milk. Thus, Eastern was properly denied reimbursement from the fund for losses on the sale of high bacteria milk.

The record also describes that Eastern purchased cream for $6,398.23 from Sun Re and that it never paid Sun Re for that cream. The Board properly offset Eastern's claim by that amount. The offset merely reflects Eastern's actual debt. The Board did not abuse its discretion by offsetting this amount since the policy of this Commonwealth is to protect producers against loss of payment for purchased milk. See 31 P.S. §625.2.

We reverse the Board's order as it applies to the deferral of Eastern's certification date, the severance

of monies on January 31, 1983, and the pro rata distribution of the security fund.

We affirm the Board's order as to its deduction of administrative costs from the security fund, the denial of Eastern's claim for high bacteria milk, and the offset of Eastern's claim by the amount it owed Sun Re for the purchase of cream.

ORDER

The order of the Milk Marketing Board dated March 30, 1983, at No. S.F. 4 is affirmed in part and reversed in part.